**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 17-10138-WGY |
| | ) | |
| 7.  NICSUOR BONCULESCU, | ) | |
|     Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On March 12, 2018, the defendant NICUSOR BONCULESCU pleaded guilty to racketeering conspiracy, conspiracy to use counterfeit access devices, and two counts of aggravated identity theft.

This defendant is scheduled for sentencing on October 30, 2018.   The government hereby submits its sentencing memorandum.   Consistent with its representations at the change of plea hearing, the government respectfully requests that the Court impose a sentence at the low end of the guidelines with respect to the defendant.

**I.     BACKGROUND OF THE CASE**

This case arose from an investigation by the FBI into an organization of Roma or Gypsy defendants engaged primarily in ATM skimming and money laundering.   The group, which the government called the Hornea Crew, consisted of member of several related families and was active in Massachusetts, Connecticut, New Hampshire, New York, South Carolina, North Carolina, and Tennessee.   PSR ¶ 8.

In summary, the defendants engaged in all three facets of skimming: stealing account information, creating cloned bank cards, and making unauthorized withdrawals or "cashing out." In addition, members of the Crew – notably the leaders, Constantin and Ludemis Hornea –

scouted locations, acquired equipment, organized travel and performed other functions.   PSR ¶ 10.   This memorandum will discuss in detail on two skimming incidents, the defendant's involvement in Western Massachusetts in the summer of 2015 and South Carolina in the summer of 2016.

### A.     Western Massachusetts

Members of the Hornea Crew participated in several successful skims (consisting of stealing information, cloning cards and cashing out) in Western Massachusetts in the Fall of 2015, including episodes in Amherst, Southwick, Weymouth and Bellingham, for example. PSR ¶¶ 26-35.   NICUSOR BONCULESCU participated in the skim in Southwick.

For the Southwick skim, the Hornea Crew, consistent with its practice, used a minor to install and remove a skimming device on September 18, 19, 20, 21, 23 and 25.   PSR ¶ 29.   The cash outs took place on September 27 and 28, 2015.   NICUSOR BONCULESCU teamed with ION BONCULESCU and made withdrawals from ATMs in West Springfield and Ludlow, Massachusetts.   PSR ¶¶ 30, 32.   During those skims, NICUSOR BONCLUSECU stole the identities of Victims 2 and 3.   PSR ¶ 32.

### B.     South Carolina

Following the arrests of LUDEMIS HORNEA and ION BONCULESCU in Braintree, Massachusetts, the Crew wrapped up its activities in Massachusetts and reconstituted in South Carolina.   PSR ¶ 68.   Crew members were living in at least two houses on the same street in Florence, South Carolina (in the Eastern part of the state), with CONSTANTIN HORNEA and MARIA LAZAR in one, and DENISA BONCULESCU with co-defendants ION BONCULESCU and NICUSOR BONCULESCU in another.   PSR ¶¶ 78-79.

Over the course of nearly one month, Crew members installed and removed skimming devices at ATMs throughout South Carolina: in Columbia (in the middle of the state), Dillon, Darlington, Mauldin, Greenville (in the Western part of the state), and Saluda.   PSR ¶ 70. DENISA BONCULESCU, accompanied by CONSTANTIN HORNEA, installed a skimming device in Columbia on June 15, 2016; she removed one from the same location the next day; and removed and installed skimming devices in Mauldin and Greenwood, on July 9, 2016.   Id. The group was caught in Saluda – and CONSTANTIN HORNEA and MARIA LAZAR arrested – when police recovered a skimming device from an ATM and were waiting for the group to retrieve the device.   PSR ¶ 71.

Law enforcement was not able to recover ATM security video of the unauthorized withdrawals from First Citizens Bank (the Crew had switched its target bank) did not, as they were able to do with unauthorized withdrawals from Bank of America.   There were also cloned cards recovered for accounts at SunTrust Bank, which were involved in skimming incidents in North Carolina.   PSR ¶ 76.   Nevertheless, First Citizens reported unauthorized withdrawals from the cards stolen in June but none from cards stolen in July—likely because CONSTANTIN HORNEA and MARIA LAZAR were in jail, and the rest of the group on the move again.   PSR ¶¶ 70, 78.   Nevertheless, NICUSOR BONCULESCU did participate in cashing out some of those skims, in particular on June 24, 2016.   PSR ¶ 71.

## II.    ADVISORY SENTENCING GUIDELINES ANALYSIS

The government affirms the guidelines analysis set forth in its representations at the change of plea hearing and adopted by the PSR.   NICUSOR BONCULESCU is base offense level 19, which the base offense level for racketeering, because it is higher than the base offense

level which would apply to the substantive fraud.[1]

NICUSOR BONCULESCU receives a three level decrease for acceptance of responsibility. PSR ¶¶ 107-108. At total offense level 16, and Criminal History Category I, his guidelines sentencing range is 21 to 27 months (plus a consecutive term of 24 months for aggravated identity theft).

## III. SECTION 3553(a) FACTORS

The government requests a sentence at the low end of the guidelines sentencing range for the defendant, which is consistent with the government's representations at each defendant's change of plea hearing. Examination of the § 3553(a) factors demonstrates that a sentence of incarceration is warranted, reasonable, and consistent with the other defendants.

### A. Nature of the Offense and Respect for the Law

Skimming, like in this case, is a financial crime. Nevertheless, two facts stand out in this case. First, the defendants were actually stealing *identities*, not just money. So while any particular victim's losses likely did not exceed $1,000, the pain and distress were likely far in excess to the financial cost. Second, skimming, and the ease with which the defendants were able to complete, harmed lots and lots of victims. As a result, the injuries were magnified many, many times—creating a total harm larger than the numbers would suggest.

Recent research bears out this point. Identity theft, and payment card fraud have increasingly posed a problem for financial institutions and law enforcement agencies. In 2017,

---

1 Pursuant to USSG § 2B1.1(a)(2), the base offense level for conspiracy to use counterfeit access devices is 6. NICUSOR BONCULESCU would receive the following enhancements: six levels for a loss of $72,922.51, pursuant to § 2B1.1(b)(2)(E); two levels because the loss involved 10 or more victims pursuant to § 2B1.1(b)(2)(A)(i); and two levels because the offense involved identity documents. PSR ¶¶ 99.

identity theft impacted 16.7 million Americans.[2]   This number represents a 6.2 million person increase since 2007.[3]   Researchers estimate that identity theft cost Americans $16.8 billion in 2017.[4]   Misuse of bank cards and credit cards, also known as payment card fraud, represents approximately 86% of all cases of identity theft each year.[5]   The United States leads the world in incidents of payment card fraud.[6]   It is the only country in the world where payment card fraud has consistently grown over the past ten years.[7]

Much of this fraud stems from skimming from gas stations and ATMs.   In 2016, banks lost an estimated $1.3 billion to debit card fraud.[8]   Approximately 54% of this fraud came from ATM skimming.[9]   According to FICO, the agency that monitors ATM transactions throughout the country, banks have reported significant increases in the number of ATM machines compromised by offenders since 2014.[10]   Between 2014 and 2015, the agency reported a 546%

---

2 *Identity Fraud Hits All Time High with 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study*, JAVELIN STRATEGY AND RESEARCH, (February 6, 2018), *available at*: https://www.javelinstrategy.com/coverage-area/2018-identity-fraud-fraud-enters-new-era-complexity
3 *See id.*; *see also* Cory Warren, *How Common is Identity Theft? (Updated 2017) The Latest Stats*, LIFELOCK, (October 13, 2017), *available at*: https://www.lifelock.com/education/how-common-is-identity-theft/
4 *Identity Fraud Hits All Time High with 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study*, JAVELIN STRATEGY AND RESEARCH, (February 6, 2018), *available at*: https://www.javelinstrategy.com/coverage-area/2018-identity-fraud-fraud-enters-new-era-complexity
5 Erika Harrell, *Victims of Identity Theft 2014*, BUREAU OF JUSTICE STATISTICS, (November 13, 2017), *available at*: https://www.bjs.gov/content/pub/pdf/vit14.pdf
6 *Skimming off the Top: Why America has such a high rate of payment-card fraud*, THE ECONOMIST, (February 15, 2014), *available at*: https://www.economist.com/news/finance-and-economics/21596547-why-america-has-such-high-rate-payment-card-fraud-skimming-top
7 *Id.*
8 Dave Kovaleski, *Banking Industry Suffered $2.2 Billion in Fraud Losses in 2016*, FINANCIAL REGULATION NEWS, (January 26, 2018), *available at*: https://financialregnews.com/banking-industry-suffered-2-2-billion-fraud-losses-2016/
9 *Id.*
10 Ann Carrns, *A.T.M. Skimming Fraud is Surging, but You Can Take Precautions*, N.Y. TIMES, (April 8, 2016) *available at*: https://www.nytimes.com/2016/04/09/your-money/safeguarding-your-atm-information-as-fraud-escalates html; *see also FICO Reports a 70 Percent Rise in Debit Cards Compromised at U.S. ATMs and Merchants in 2016*, FICO, March 29, 2017, *available at*: http://www fico.com/en/newsroom/fico-reports-a-39-percent-rise-in-debit-cards-compromised-at-us-atms-and-merchants-08-31-2017

increase in compromised ATMs.[11]   FICO also reported an increase in the number of compromised cards by 39% in the first six months of 2017, as compared to 2016.[12]

Payment card fraud can be profitable for criminals who engage in it, but causes economic damage to society as whole.   According to a representative of the American Bankers Association, ATM fraud is more profitable than bank robberies, with the average criminal making $30,000-$50,000 prior to apprehension.[13]   FICO estimated that loss per card amounted to $600.[14]   Payment card fraud affects the market as a whole by affecting consumer actions. Surveys suggest that 44% of Americans rely on their debit cards to complete every day purchases and that debit card skimming reduces an individual's inclination to use a debit card.[15] Fraud undermines trust in the banking institutions and causes distress to those affected by it. Accordingly, the government must seek to deter this type of criminal action and minimize its economic impact.   Breaking up organized criminal entities that engage in skimming is a priority for the economic health of the country.

In addition to its economic impact, payment card fraud also has a human impact.   It has adverse effects for victims that can be long lasting and difficult to repair.   Most victims of payment card fraud do not know how their data was compromised until receiving information

---

11 Andrew Meola, *ATM Fraud in the U.S. is Growing at an Alarming Rate – and One Area in Particular is at Risk*, BUSINESS INSIDER, (April 12, 2016), *available at*: http://www.businessinsider.com/atm-fraud-in-the-us-is-growing-at-an-alarming-rate-and-one-area-in-particular-is-at-risk-2016-4
12 *FICO Reports a 39 Percent Rise in Debit Cards Compromised at U.S. ATMs and Merchants*, FICO, (August 31, 2017), *available at*: http://www fico.com/en/newsroom/fico-reports-a-39-percent-rise-in-debit-cards-compromised-at-us-atms-and-merchants-08-31-2017
13 Penny Crossman, *How is ATM Fraud Still a Thing?*, PAYMENTSSOURCE, (April 19, 2017), *available at*: https://www.paymentssource.com/news/how-is-atm-fraud-still-a-thing
14 Ann Carrns, *A.T.M. Skimming Fraud is Surging, but You Can Take Precautions*, , N.Y. TIMES, (April 8, 2016) *available at*: https://www.nytimes.com/2016/04/09/your-money/safeguarding-your-atm-information-as-fraud-escalates html
15 Erin El Issa, *Americans favor Debit Over Credit for Their Go-To Card*, Nerdwallet, September 7, 2017, *available at*: https://www.nerdwallet.com/blog/credit-cards/credit-debit-survey-2017/

from their financial institutions.[16]   Nine out of ten victims of identity theft have no information about the identity of the offender.[17]   Victims of identity theft reported adverse financial consequences, with two thirds of victims reporting direct financial loss.[18]   In addition to financial loss, three fourths of surveyed victims reported emotional distress.[19]   The consequences for a victim depend on the quick resolution of the problem by a bank.[20]   The longer it takes to reach a resolution, the more adverse consequences a victim experiences.[21]

The large number of victims and the intrusiveness of their losses carve out harm across a wide swath of our community, both in Massachusetts and the rest of the country.   Ultimately, victims lose confidence in the modern economy and the economy's ability to keep them and their information safe.   These economic and human costs of payment card fraud necessitate a tough response to criminal offenders.   The government believes that the sentences requested here will help punish that harm, promote respect for the law and generally deter others who might think to become involved in skimming.

B.    Roles in the Offense

NICUSOR BONCULESCU belongs in the middle tier of defendants in this case—neither leader nor minor participant.   NICUSOR BONCULESCU's involvement ran from nearly the beginning of the scheme, in Western Massachusetts in the Fall of 2015, through the end in South

---

16  Harrell. at 5.
17  *Id.*
18  *Id.*
19 Identity Theft: The Aftermath 2017, IDENTITY THEFT RESOURCE CENTER, 9, (2017),   *available at*: https://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf
20  Erika Harrell, *Victims of Identity Theft 2014*, BUREAU OF JUSTICE STATISTICS, (November 13, 2017), *available at*: https://www.bjs.gov/content/pub/pdf/vit14.pdf
21  *Id.*

Carolina in the Summer of 2016. NICUSOR BONCULSCU participated in multiple episodes, in Southwich and South Carolina. In South Carolina, NICUSOR's sister, previously sentenced defendant DENISA BONCULECU, also participated. As a result, NICUSOR BONCULESCU was a full-fledged member of the Crew.

### IV. COMPARISON AMONG OTHER DEFENDANTS

Every defendant is sentenced independently for his own case. Nevertheless, the government's recommendation in this case is consistent with its recommendations for the other defendants and places NICUSOR BONCULESCU properly in comparison with the other defendants, taking into account the seriousness of their respective offenses, their roles in the joint activity, the length of their involvement culpability, and even profit. In the government's view, NICUSOR BONCULESCU belongs in the middle tier of defendants.

At the top belong CONSTANTIN DENIS HORNEA and his brother LUDEMIS HORNEA, the leaders of the Hornea Crew. They participated throughout the conspiracy (although LUDEMIS's involvement was halted by his arrest and incarceration in Massachusetts); they led the Crew; and they were involved in all facets of the criminal activity. CONSTANTIN HORNEA received a sentence of 65 months' imprisonment, with a sentencing range of 65 to 76 months) and LUDEMIS HORNEA received a sentence of 42 months imprisonment, with a sentencing range of 61 to 70 months, which incorporated a credit of 15 months served in state prison for the underlying conduct that otherwise would not have counted. As a result, CONSTANTIN HORNEA received a sentence at the low end of his respective guidelines range and LUDEMIS HORNEA effectively a sentence just four months below the low end (approximately a 10% variance), plus the mandatory consecutive term of 24 months.

At the bottom tier were DENISA BONCULESCU, ANAMARIA MARGEL and ION TRIFU. As the government stated at their sentencing hearings, these defendants belong in the lowest tier of culpability because each participated in a single episode, did not personally cash-out themselves and played support roles (for DENISA BONCULESCU, installing and removing devices in South Carolina; for ANAMARIA MARGEL, renting rooms and installing and removing devices in Quincy, Massachusetts; and for ION TRIFU, money laundering in connection with Quincy). DENISA BONCULESCU was sentenced to 21 months' incarceration, on a sentencing range of 27 to 33 (slightly higher than many codefendants because she was a higher CHC); ANAMARIA MARGEL was sentenced to 16 months' imprisonment, on a sentencing range of 21 to 27 months; and ION TRIFU, who was sentenced to 12 months and one day in prison on a sentencing range of 12 to 18 months. Accordingly, each defendant received either a small departure (approximately 22% or 23%) or a within Guidelines, relatively light sentence.

NICUSOR BONCULESCU belongs in the middle tier of defendants because he participated in multiple episodes, obtained money himself by cashing-out, and stole the identities of Victims 2 and 3. The only other defendant to have been sentenced so far who belongs in this middle tier is MARIA LAZAR, who was sentenced to 27 months' imprisonment pursuant to a C plea agreement with the government. The government agreed to recommend a below guidelines sentence for LAZAR because of what the government considered compelling mitigating circumstances: she was the mother of a young child and appeared to have become involved through the agency of her husband, lead defendant CONSTANTIN HORNEA, whom she married at a young age. Those circumstances are not the case for NICUSOR

BONCULESCU.

## V. THE GOVERNMENT'S RECOMMENDATIONS

For the reasons stated above, and pursuant to 18 U.S.C. §3553(a), the government requests that the Court impose the following sentence:

(a) incarceration for a term of forty-five months (21 months for the racketeering and access device conspiracies (i.e., Counts One and Two) and 24 months consecutive for aggravated identity theft);

(b) no fine;

(c) 36 months of supervised release;

(d) a mandatory special assessment of $400; and

(e) restitution of $79,922.51, payable to Bank of America.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:   s/ Timothy E. Moran
TIMOTHY E. MORAN
Assistant U.S. Attorney

### CERTIFICATE OF SERVICE

I, Timothy E. Moran, Assistant U.S. Attorney, certify that I caused a copy of the foregoing sentencing memorandum to be served by ECF notice to defense counsel.

s/ Timothy E. Moran
TIMOTHY E. MORAN
Assistant U.S. Attorney

Dated: October 23, 2018

